Filed 10/7/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| In re TERRANCE BUTLER on Habeas Corpus. | A159122, A159247 (Alameda County Super. Ct. No. 154207) |
|---|---|

Terrance Butler was convicted in 1993 of raping two women and assault with intent to commit rape of a juvenile and sentenced to 18 years in state prison. Prior to his release, the Alameda County District Attorney filed a petition in November 2006 to commit Butler as a sexually violent predator (SVP) under the Sexually Violent Predators Act (SVPA). (See Welf. & Inst. Code,[1] § 6600 et seq.) Despite numerous demands from Butler that he receive a trial as soon as possible and explicit direction to the Alameda County Public Defender's office that it was not authorized to waive time on his behalf, no trial was ever held.

Butler was confined to a state hospital for 13 years awaiting trial on his SVP petition, during which time eight public defenders and six prosecutors cycled through his case, three trial dates were set and vacated, and more than 50 continuances were granted without a single objection raised by opposing counsel or a finding of good cause made by the trial court. There is

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

no evidence that any of Butler's public defenders ever consulted or retained a defense expert in this matter, and the prosecution never declared it was prepared to go to trial or insisted that a trial date be set. Indeed, after the trial court ordered a new probable cause hearing in May 2012, no such hearing was held, and Butler was detained for the next six years without a finding of probable cause.

After the public defender declared a conflict in January 2019, Butler's appointed private counsel filed a petition for writ of habeas corpus. The habeas court found, following an evidentiary hearing and close examination of the procedural record, that Butler's due process right to a timely trial had been violated and that the public defender, district attorney, and trial court all bore some responsibility for this "extraordinary" delay. In December 2019, the court granted Butler's habeas petition, dismissed the SVP petition, and ordered Butler's release. We stayed the habeas court's order pending our review of the district attorney's appeal.

The district attorney contends that she has no affirmative obligation to bring a person to trial on an SVP petition and that the trial court erred by failing to attribute to Butler the entirety of the delay in this matter. We disagree. Because involuntary civil confinement involves a substantial deprivation of liberty, an alleged SVP defendant is entitled under the due process clause to a trial at a meaningful time and in a meaningful manner. We reaffirm the principle that the ultimate responsibility for bringing an accused SVP detainee to trial rests with the state. The record here amply supports the habeas court's finding that blame for the delay must be shared between a district attorney's office that abdicated its responsibility for prosecuting this case, a public defender's office that disregarded Butler's repeated demands for trial, and a trial court that took no meaningful action

2

to set deadlines or otherwise ensure that Butler's right to a timely trial was protected. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The SVPA

"Under the SVPA, the state can civilly commit individuals found to be SVPs after they conclude their prison terms." (*Reilly v. Superior Court* (2013) 57 Cal.4th 641, 646 (*Reilly*).) Section 6600, subdivision (a)(1), defines an SVP as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." The SVPA is intended " 'to protect the public from dangerous felony offenders with mental disorders and to provide mental health treatment for their disorders.' " (*People v. McKee* (2010) 47 Cal.4th 1172, 1203 (*McKee*).)

"Before a petition may be filed under the [SVPA], the inmate must first be screened by the Department of Corrections and Rehabilitation, generally at least six months before his or her scheduled release date. (§ 6601, subd. (a).) This screening is conducted in accordance with a structured screening instrument and is 'based on whether the person has committed a sexually violent predatory offense and on a review of the person's social, criminal, and institutional history.' (*Id.*, subd. (b).) If the Department of Corrections and Rehabilitation determines that the inmate is likely to be an SVP, it refers the matter to the Department of State Hospitals for a 'full evaluation' regarding whether the inmate meets the criteria in section 6600. (§ 6601, subd. (b).)" (*People v. Superior Court* (*Couthren*) (2019) 41 Cal.App.5th 1001,1008 (*Couthren*).)

3

The Department of State Hospitals then assigns two psychiatrists or psychologists (§ 6601, subd. (d)) to examine the person "in accordance with a standardized assessment protocol which requires an 'assessment of diagnosable mental disorders, as well as various factors known to be associated with the risk of reoffense among sex offenders.' (§ 6601, subd. (c).)." (*Couthren*, *supra*, 41 Cal.App.5th at p. 1009.)  If two independent professionals concur that the inmate meets the criteria for commitment as an SVP, the director of the Department of State Hospitals forwards a request that a commitment petition be filed to the county in which the inmate was convicted of the offense for which he or she is currently incarcerated.  (§ 6601, subds. (f), (h)(1) & (i).)  If designated counsel in that county concurs with the recommendation, he or she then files a commitment petition in superior court.  (*Id.*, subd. (i)).

"Once an SVP petition has been filed, '[a] judge of the superior court shall review the petition and shall determine whether there is probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release.' (§ 6602, subd. (a).)  The probable cause hearing is not a determination of the merits of the petition.  Rather—as in preliminary proceedings under the criminal law—the sole purpose of the probable cause hearing is to test the sufficiency of the evidence supporting the petition.  [Citation.]  Thus, the trial court at a probable cause hearing under the [SVPA] must determine 'whether a reasonable person *could entertain a strong suspicion* that the petitioner has satisfied all the elements required for a civil commitment as an SVP.' [Citations.]  A failure to find probable cause leads to dismissal of the petition. (§ 6602, subd. (a).)" (*Couthren*, *supra*, 41 Cal.App.5th at p. 1009.)

4

If, on the other hand, there is a finding of probable cause, the court orders "that the person remain in custody in a secure facility until a trial is completed and shall order that a trial be conducted to determine whether the person is, by reason of a diagnosed mental disorder, a danger to the health and safety of others in that the person is likely to engage in acts of sexual violence upon his or her release." (§ 6602, subd. (a).) Either party may demand a jury trial in an SVP commitment proceeding. (§ 6603, subds. (a), (b).) The alleged SVP has the right to the assistance of counsel, to retain experts, and to access relevant psychological and medical reports. (*Id.*, subds. (a) & (j).) The SVPA also contains "provisions for the evaluations to be updated or replaced after the commitment petition is filed in order 'to obtain up-to-date evaluations, in light of the fact that commitment under the SVPA is based on a "current" mental disorder.' " (*People v. Superior Court (Vasquez)* (2018) 27 Cal.App.5th 36, 43 (*Vasquez*).)

The People must prove beyond a reasonable doubt that each of the statutory elements under the SVPA has been established (§ 6604), and a jury verdict must be unanimous (§ 6603, subd. (g). If the court or jury determines that the person is a sexually violent predator, the person is "committed for an indeterminate term to the custody of the State Department of State Hospitals for appropriate treatment and confinement in a secure facility designated by the Director of State Hospitals."[2] (§ 6004.)

---

[2] Proposition 83, passed by the voters in November of 2006, modified the length of confinement under the SVPA from "a two-year term, renewable only if the People prove to a jury beyond a reasonable doubt that the individual still meets the definition of an SVP, to an indefinite commitment from which the individual can be released if [he or she] proves by a preponderance of the evidence that [he or she] no longer is an SVP." (*McKee, supra,* 47 Cal.4th at pp. 1183–1184.) The petition in this case was filed

5

After commitment, an SVP is evaluated every year to consider "whether the committed person currently meets the definition of a sexually violent predator and whether conditional release to a less restrictive alternative, pursuant to Section 6608, or an unconditional discharge, pursuant to Section 6605, is in the best interest of the person and conditions can be imposed that would adequately protect the community." (§ 6604.9) Under certain circumstances, an SVP may petition the court for either conditional release (§ 6608) or unconditional discharge (§ 6605).

## B.    The SVP Petition

In November 2006, the district attorney filed a petition to commit Butler as an SVP prior to his upcoming release from prison. The petition alleged that Butler had been convicted of five sexually violent offenses within the meaning of section 6600, including a 1991 rape and three 1992 rapes (Pen. Code, § 261) and a 1992 assault to commit rape (*id.*, § 220). It further alleged that Butler suffered from a diagnosed mental disorder and posed a danger to the health and safety of others within the meaning of section 6600, subdivisions (c) and (d).

### i.    *From 2006 through 2011*

For the first year after the petition was filed, Butler was represented by Assistant Public Defender Clif Taylor. Butler appeared at the first four court appearances, including the probable cause hearing held in January 2007. Taylor appeared on Butler's behalf four additional times, waiving Butler's appearance each time. Taylor initially requested time to file a motion to dismiss based on recent amendments to the SVPA, which was filed in December 2006 and denied after opposition in January 2007.

---

shortly after this change went into effect, subjecting Butler to the possibility of indefinite confinement if he was determined to be an SVP.

6

In December 2006, Butler sent two letters to the assigned judge, the Honorable Joan S. Cartwright, which described his concerns with the SVP process and were considered in connection with his eventual petition for writ of habeas corpus. Butler wrote that he acted upon the advice of his attorney to waive time and go into treatment. He went on to state: "Your Honor, you asked me if that was what I really wanted, but truthfully it's not. I want to go home to my kids. Judge Cartwright, what I truly want is for the D.A.'s office, the Court & the State of California to keep their end of the plea bargain deal we made in 1993." Butler described his rehabilitation at length, stating he was not an SVP, and emphasized that he wanted to return to his children and sisters.

At the probable cause hearing on January 19, 2007, probable cause was found and Butler was ordered detained at Coalinga State Hospital pending trial. After a number of continuances, an initial trial date was set in December 2007 for June 2008. Taylor retired shortly thereafter. The habeas court later found no evidence in the record that Taylor had advised Butler about his right to a timely trial or that Butler had personally waived time for trial.

Assistant Public Defender Michael McCormick took over Butler's case around February 2008 and continued to represent him until July 2011. McCormick appeared on Butler's behalf 17 times, waiving Butler's appearance each time. In March 2008, the court granted the prosecution's motion to vacate the trial date due to a conflict with the deputy district attorney's vacation schedule. McCormick did not object to the continuance because he had not yet retained experts and was not ready for trial.

The matter was continued to June 2008 for setting. On that date, McCormick received a continuance to September 2008 because he was

planning to set three other matters for trial. A further continuance was granted to October 2008 for a motion to dismiss. McCormick filed the motion in October 2008, and, after opposition, it was denied in November 2008. McCormick then asked to have the matter continued to December 2008 and then again to March 2009. The prosecution did not oppose any of these continuances.

On March 12, 2009, Butler sent McCormick a letter stating: "I am requesting to be taken to trial as soon as possible, and I reiterate that I have never given the Public Defender[']s Office permission to waive time on my behalf in this legal matter. [¶] I've been sitting in Coalinga State Hospital for exactly 2 years now and my due process has been violated. I will be looking forward to hearing from you real soon in regards to this matter. Thank you Mr. McCormick for all you have done thus far for me." As discussed below, McCormick was called to testify at the August 2019 evidentiary hearing on the habeas petition concerning his response to this letter and his trial strategy in general. The habeas court would later find no evidence in the record that McCormick had informed the trial court about Butler's March 12th letter or that McCormick had ever asserted Butler's right to a timely trial. The case was continued again to April 2009, and then to May 2009 to set a trial date. In May 2009, a second trial date was set for January 19, 2010.

In September 2009, McCormick added the matter to calendar to request that the January 2010 trial date be vacated because he had another trial set at the same time. McCormick did not explain when the other trial had been set, and the trial court did not inquire. The prosecution did not object, and McCormick did not disclose Butler's demand for a timely trial. The January trial date was vacated and reset to May 24, 2010. In March

8

2010, the third trial date was also vacated and the matter was continued to June 2010 to set a motion to dismiss under *In re Ronje* (2009) 179 Cal.App.4th 509 (*Ronje*), disapproved in part by *Reilly*, *supra*, 57 Cal.4th at p.655.[3] McCormick later testified that he had explained this strategy of pursuing a motion to dismiss under *Ronje* rather than seeking a trial and had obtained Butler's approval. However, the *Ronje* motion would take the public defender's office *three* years to prepare, and as the habeas court would find, there was no evidence that Butler was informed he would have to wait three years before such motion would even be filed.

In June 2010, September 2010, January 2011, and April 2011, McCormick, or another public defender appearing on his behalf, asked that the case be continued pending the *Ronje* motion. The prosecution did not object. The case was continued to July 29, 2011. In July 2011, McCormick was transferred to a different assignment.

Over this first five-year period, the case was continued approximately 17 times without objection, three trial dates were set and vacated, and Butler's personal appearance was waived 21 times. Butler's demand for a timely trial and his explicit nonconsent to waiver of time were never

---

[3] In August 2008, the Office of Administrative Law determined that various portions of the 2007 version of the SVP assessment protocol constituted invalid underground regulations because the provisions had not been adopted pursuant to the Administrative Procedure Act (Gov. Code, § 11340.5 et seq.). (See *Ronje, supra,* 179 Cal.App.4th at p. 515.) In *Ronje*, the appellate court held that where evaluations had been prepared under the invalid protocol, the appropriate remedy was to order new evaluations using a valid protocol and to conduct a new probable cause hearing based on those new evaluations. (*Id.* at p. 519.) In 2013, the California Supreme Court in *Reilly*, *supra,* 57 Cal.4th 641, disapproved of the remedy ordered under *Ronje* absent a showing that material error had occurred in the assessment process. (*Id.* at p. 655.)

9

conveyed to the trial court. No new trial date was set after the March 24, 2010 trial date was vacated.

### ii. From 2011 through 2016

Assistant Public Defender George Higgins represented Butler from July 2011 through 2014. Higgins made 15 appearances for Butler, waiving his appearance each time. In July 2011, the matter was continued to December 2011 and again to March 2012, followed by defense counsel's request for a continuance to May 2012—all to set the hearing date for the *Ronje* motion. The record does not indicate which party sought the first two continuances, but no objection was stated on the record to any request.

The *Ronje* motion was finally filed in April 2012 and argued in May. The motion sought new evaluations performed by different evaluators and a new probable cause hearing. On May 18, 2012, Judge Cartwright granted the motion in part and ordered new evaluations and a new probable cause hearing for Butler but declined to require new evaluators. The prosecution explained that new evaluations usually took about 45 days and asked to continue the matter to July 2012 for receipt of the evaluations and setting. Higgins did not object. In July 2012, the evaluations had not been received and the case was continued to November 2012. In November 2012, the prosecution asked that the probable cause hearing be set for April 5, 2013, again without objection from Higgins. In March 2013, defense counsel entered a special appearance and requested that the probable cause hearing date be vacated and continued to another setting date in July 2013, and the prosecution agreed. No probable cause hearing was ever held.[4]

---

[4] The habeas court concluded that this fact meant that Butler has been held for over 13 years without a valid finding of probable cause. As noted above, however, *Reilly* held that a new probable cause hearing was not required absent a showing that material error had occurred in the

10

In July 2013, the matter was continued again by Butler's counsel with no objection to October 2013 for the filing of a motion to dismiss involving the propriety of Butler's diagnoses under *Kansas v. Crane* (2002) 534 U.S. 407 (*Crane*). Higgins received another uncontested continuance to January 2014, filing the *Crane* motion in November 2013. In the meantime, the matter was reassigned to the Honorable Alan D. Hymer in January 2014. The hearing on the *Crane* motion was then continued repeatedly, as least twice at Higgins's request, until the motion was finally argued and denied in July 2014.[5] The court suggested continuing the case to November 2014 to set and neither party objected. In November 2014, Higgins asked that the matter be continued to February 20, 2015 for another motion to dismiss, which he filed in December. The prosecution did not oppose the continuance and the matter was continued to February 2015.

Deputy Public Defender Adrienne Elenteny represented Butler from February 2015 to August 2016, appearing at least 10 times for Butler and

---

assessment process. (See fn. 3, *ante*; *Reilly, supra,* 57 Cal.4th at p. 655.) It does not appear that the *Ronje* motion asserted material errors in Butler's evaluation. Even so, *Reilly* did not issue until August 2013—more than a year after the trial court's May 2012 order—and it is troubling that no probable cause hearing was held in the interim or at any point thereafter. At a minimum, the prosecution should have requested reconsideration of the court's May 2012 order if it believed a new probable cause hearing was unnecessary in light of *Reilly*, and the defense should have insisted on this basic procedural protection. The trial court failed to resolve this significant outstanding issue on the record.

[5] The *Crane* motion argued that Butler's federal due process rights had been violated because the two mental health diagnoses alleged in the SVP petition were not "mental disorders" as defined by the SVPA. The habeas court questioned why counsel waited until 2013 to file the *Crane* motion rather than challenge the diagnoses in 2008, but more importantly, why the motion was even necessary given Butler's successful *Ronje* motion and the trial court's May 2012 order for new evaluations.

11

waiving his appearance each time. The case was continued from February 2015 to May by stipulation of the parties, then to June, then again by agreement to August 2015, and finally to October 2015 at Elenteny's request. In October 2015, the motion to dismiss was heard and denied, and, after the prosecution remarked that it appeared there had been a probable cause hearing in January 2007, the matter was continued to January 8, 2016 to set for trial. Neither the prosecution nor the defense brought to Judge Hymer's attention the intervening order of May 2012 for a new probable cause hearing.

On January 8, 2016, defense counsel asked to put the case over to January 22. At Elenteny's request, the setting date was again continued to May and then September 2016. In September, a further continuance advanced the case January 2017. No reason was offered on the record for these continuances, and no objection was asserted by the prosecution.

Over this second five-year period, the case was continued approximately 25 times either by mutual request or without objection. No probable cause hearing was held pursuant to the court's May 2012 order, nor was a trial date set. Butler's personal appearance was waived 25 times. There is no evidence in the record that Butler's defense counsel ever conveyed Butler's desire for a timely trial or his nonconsent to waiver of time.

### iii.    From 2017 through 2018

Assistant Public Defender Klaus represented Butler from September 2016 to January 2019, waiving his appearance 11 out of 13 times. Klaus first appeared for Butler in January 2017, continuing the matter to May. The case was then continued nine more times—twice by agreement and once for the prosecutor's "planned absence"—until it was finally advanced to

12

December 7, 2018, to set a jury trial date. The prosecutor reportedly requested updated evaluations in September or October 2018.

Butler was transported to court for a *Marsden*[6] hearing on December 3, 2018. At that hearing, Butler addressed the court, asserting that the public defender's office had failed to represent him competently by declining to bring his case to trial and that he had never agreed to any continuances. Klaus stated that Butler's file "indicate[s] that from when he first came to our office in 2006, Mr. Butler was requesting a trial." He acknowledged Butler's March 2009 letter to McCormick requesting a trial. Klaus further reported that, when he first met Butler in September 2016, Butler expressed his desire to proceed to trial. By August 2017, Butler conveyed "real concern" to Klaus regarding how he kept getting transferred from lawyer to lawyer. Butler reiterated his desire to go to trial in November 2017. After that, Klaus began talking with the prosecution about going to trial, Butler reentered treatment, and new evaluations were ordered. Klaus acknowledged that he needed to hire experts to assess the new evaluations, and he anticipated selecting a trial date for some time in the winter or early spring of 2019. As the habeas court would find, however, there is no evidence that the public defender's office ever retained or consulted with an expert during its 12-year representation of Butler.

Butler argued that the public defender's disregard for his speedy trial rights constituted incompetent representation. He told the court: "[I]t's been 12 years and 12 years I can't get back out of my life." He went to the state hospital and did "everything that they asked me to do, and the Public Defender's office failed to notify me that my due process rights have been violated." He added: "It's like they are breeding attorneys to basically pretty

---

[6] *People v. Marsden* (1970) 2 Cal.3d 118.

13

much treat cases like a relay race, just pass the baton every couple years, and they all requested to start over; they need an opportunity to review my case." Noting the years he had lost away from his family, Butler declared: "Whether they want to go to trial is not my interest."

The trial court denied the *Marsden* motion, opining "that much of the delay has been caused by the various motions . . . that were not frivolous motions. They were motions that might be brought within the particular circumstances of an SVP case by a competent attorney. So in that respect, I think that Mr. Butler has been represented competently." The court nevertheless found that Butler's right to a timely trial had been "severely compromised," and stated its intent to set a trial date a few days later on December 7 so that the case "may be tried just as soon as possible." Butler personally objected to this plan, stating he intended to file a writ petition in the Court of Appeal challenging the trial court's decision. The case was subsequently continued on December 7 and December 21, 2018 without setting a date for trial.

In the final two-year period in which Butler was represented by the public defender, the case was continued approximately 12 times, Butler's appearance was waived 11 out of 13 times, and no trial was set, possibly because Butler had indicated he would seek writ relief or a dismissal of the SVP petition.

## C. *The Petition for Writ of Habeas Corpus*

In January 2019, the public defender declared a conflict of interest. New counsel was appointed and filed the instant petition for writ of habeas corpus in April 2019, alleging that Butler had been denied his due process right to a timely trial on the SVP petition. At the August 2019 evidentiary hearing on the habeas petition, McCormick was called to testify by the

district attorney. He was the sole witness at the hearing. Butler did not testify but filed a declaration stating, among other things, that he had never waived his right to a speedy trial and had never authorized an attorney to waive that right for him.

McCormick testified that he received Butler's March 2009 letter soon after it was dated. Although the letter made clear that Butler had not authorized the public defender's office to waive time on his behalf and demanded a trial as soon as possible, McCormick did not discuss the concept of a speedy trial right with Butler. He also testified that he did not seek or obtain a time waiver (written or oral) from Butler. McCormick did not recall if he had explained that Butler was entitled to be present in court, but he would have made arrangements to bring Butler to court had Butler requested it. The habeas court found there was no evidence that McCormick sought or obtained authorization from Butler to waive his appearance.

McCormick advised Butler to pursue a strategy of challenging the SVP petition by legal motion rather than trial. He explained why he viewed a strategy of collateral attack as less risky than going to trial. Delaying trial could be advantageous for an alleged SVP because it allowed the individual to participate in treatment, which might lead a subsequent evaluator to conclude that the individual no longer met the criteria for commitment. He testified that Butler had agreed to this strategy of collateral attack.

McCormick was asked about the trial dates set in Butler's case. He did not oppose the People's request to vacate the first trial date in June 2008 because the defense had yet to retain an expert. After receiving Butler's March 2009 letter, McCormick set a January 2010 trial date because he had other trials set in the interim. McCormick later consulted with Butler before

15

vacating the May 2010 trial date to pursue a *Ronje* motion, and Butler agreed with that strategy.

In a detailed 70-page decision, the court granted Butler's habeas petition on December 3, 2019. While the matters on record were largely undisputed, the court made several pertinent findings of fact which are summarized here and discussed in the context of the due process challenge below.

The habeas court found that Butler made sincere and repeated demands for a speedy trial as early as December 2006 and throughout his 12-year period of detention awaiting trial. The court cited his December 2006 letters to Judge Cartwright, March 2009 letter to McCormick, and his September 2016, August 2017, and November 2017 communications with Klaus.

The court found that this matter had been calendared 66 times from December 15, 2006, the date the SVP petition was filed, to April 3, 2019, the date the habeas petition was filed. Butler appeared in court only six times. Four of those appearances were in the first two months of the case. Butler would not appear again in court for more than 12 years. Butler's appearance was waived by his public defenders 60 times.

At least eight public defenders appeared in Butler's matter, including the five assigned public defenders discussed above. The habeas court found no evidence that any of Butler's public defenders ever retained or consulted a defense expert on his behalf. The court found no evidence that any of Butler's public defenders ever stated on the record that Butler wanted a timely trial. It found no evidence that any public defender ever discussed, sought, or obtained from Butler a waiver of his right to a timely trial. It found no evidence that his public defenders ever asked the court to conduct a second

16

probable cause hearing following the court's May 2012 order. In 12 years of representing Butler, five attorneys filed four motions on his behalf. The habeas court determined that Butler's public defenders essentially ignored and disregarded his demands for a timely trial.

The court found that at least six prosecutors had appeared on Butler's matter. The habeas court found that the People never objected on the record to a single continuance. It found that the People never requested that the court find good cause for any continuance. The court found that the People never declared on the record that they were ready for trial and never requested that the public defender's office be relieved. The habeas court determined that the People had no intention of moving the case past the initial probable cause hearing in January 2007 and were content to allow Butler to be detained indefinitely. In the court's view, the People had abandoned their role as the plaintiff in this case.

Butler's matter was assigned to Judge Cartwright from December 2006 to December 2013, and to Judge Hymer from January 2014 to May 2019. The habeas court found that Judge Cartwright postponed and vacated all three trial dates without requiring and finding good cause on the record. It found that the matter was called at least 25 times under Judge Cartwright, and at least 33 times under Judge Hymer. The habeas court found that in both periods, the trial court allowed the matter to be continued without ever requiring an on-the-record showing of good cause and without ever finding good cause on the record. Although new evaluations were received in November 2012 in compliance with the May 2012 order, no second probable cause hearing was ever held, and no trial date was set after May 2010. Finally, it found no evidence that the trial court ever asked counsel whether Butler objected to the continuances or wanted a trial.

17

After analyzing the factors set forth in the United States Supreme Court's decisions in *Barker v. Wingo* (1972) 407 U.S. 514 (*Barker*) and *Mathews v. Eldridge* (1976) 424 U.S. 319 (*Mathews*), the habeas court concluded that Butler had been denied due process and that the blame for the delay was shared by the prosecution, the defense, and the trial court, "each to varying degrees," but that ultimate responsibility for the delay fell on the trial court. In reaching this conclusion, the court declined to consider whether there had been a systemic breakdown in the public defender system, concluding instead that there had been a systemic breakdown in the management of Butler's case. It granted the relief sought by Butler: release from custody and dismissal of the SVP petition.

The trial court stayed Butler's release for 21 days to allow the district attorney to file an appeal. The district attorney did so on December 18, 2019. We granted the district attorney's petition for writ of supersedeas, staying the trial court's order pending resolution of the appeal. On our own motion, we consolidated the district attorney's appeal (case No. A159247) with the writ petition (case No. A159122) and the consolidated matter is now before us for decision.

## II. DUE PROCESS RIGHT TO A TIMELY TRIAL UNDER THE SVPA

The SVPA sets out detailed procedures for the involuntary civil commitment of individuals determined to be SVPs—from initial evaluations to the filing of a petition, a probable cause determination, a trial on the statutory elements, and finally, treatment and options for release. (§§ 6600-6608.) What the SVPA does not do, however, is delineate a timeframe within which a trial must be held once a court has found probable cause to sustain the SVP petition. (*People v. Landau* (2013) 214 Cal.App.4th 1, 27 (*Landau*);

18

see *Vasquez, supra*, 27 Cal.App.5th at p. 57.)[7]  Moreover, a trial under the SVPA is a civil proceeding, not a criminal proceeding to which the Sixth Amendment right to a speedy trial attaches.  (*Vasquez*, at p. 57.)

Nevertheless, civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protections. (*Foucha v. Louisiana* (1992) 504 U.S. 71, 80 (*Foucha*); *Addington v. Texas* (1979) 441 U.S. 418, 425 (*Addington*).)  "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."  (*Foucha*, at p. 80; see *Zadvydas v. Davis* (2001) 533 U.S. 678, 690 ["Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects."].)  The potential for indefinite civil confinement under the SVPA only heightens the need for due process protections.  (*Mathews, supra*, 424 U.S. at p. 335 [requiring consideration of "the private interest that will be affected by the official action" in determining the process that is due].)

" 'The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." ' "  (*People v. Litmon* (1983) 162 Cal.App.4th 383, 395 (*Litmon*), quoting *Armstrong v. Manzo* (1965) 380 U.S. 545, 552.)  "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.' "  (*Cleveland Board of Education v. Loudermill* (1985) 470 U.S. 532, 542.)  " 'If the right to notice and a hearing is to serve its full purpose, . . . it must be granted at a

---

[7] As *Landau* observed, "[a] person alleged to be an SVP is entitled to a probable cause hearing within 10 days of a judge's facial review of the SVP petition (§ 6601.5), but no time guideline is set for trials."  (*Landau, supra,* 214 Cal.App.4th at p. 27, fn. 8.)

time when the deprivation can still be prevented.' " (*People v. Castillo* (2010) 49 Cal.4th 145, 165 (*Castillo*).) "We tolerate some exceptions to the general rule requiring predeprivation notice and hearing, but only in ' "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." ' " (*Castillo*, at p. 165, quoting *United States v. James Daniel Good Real Property* (1993) 510 U.S. 43, 53.)

In light of the substantial deprivation of liberty caused by the pretrial confinement of an alleged SVP, we agree with our sister Courts of Appeal in concluding that an alleged SVP detainee is entitled under the due process clause to a timely trial despite the absence of a specific statutory requirement. (*People v. DeCasas* (Aug. 31, 2020, B301297) ___ Cal.App.5th ___ [2020 Cal.App.LEXIS 879 at pp. *26–*28] (*DeCasas*); *Vasquez, supra,* 27 Cal.App.5th at p. 56; *Landau, supra,* 214 Cal.App.4th at p. 31; *Litmon, supra,* 162 Cal.App.4th at pp. 399–402; see *Castillo, supra,* 49 Cal.4th at pp. 163–168 [discussing *Litmon* at length and noting it "reviewed long-established procedural due process decisions of the United States Supreme Court" as well as other high court cases in establishing a due process right to be heard at a meaningful time in an SVP proceeding]; *People v. Otto* (2001) 26 Cal.4th 200, 209 ["Because civil commitment involves a significant deprivation of liberty, a defendant in an SVP proceeding is entitled to due process protections"].)

Neither the California Supreme Court nor the United States Supreme Court has determined how a due process claim of excessive pretrial delay in the context of involuntary civil commitment proceedings should be evaluated. Several of our Courts of Appeal, however, have reviewed claims arising from SVPA commitment proceedings under the balancing tests articulated in *Barker, supra,* 407 U.S. 514 and *Mathews, supra,* 424 U.S. 319.

20

(See, e.g., *Vasquez*, *supra*, 27 Cal.App.5th at pp. 60–82; *Landau*, *supra*, 214 Cal.App.4th at pp. 33–44; *Litmon*, *supra*, 162 Cal.App.4th at pp. 399–406.) Moreover, as stated above, the trial court here conducted an analysis under both *Barker* and *Mathews*, leading to its conclusion that Butler's due process right to a timely trial had been violated. We will address the district attorney's claims of error against this precedent.

## A. *Mathews* Due Process Test

In *Mathews*, *supra*, 424 U.S. 319, the United States Supreme Court considered whether due process required an evidentiary hearing prior to the termination of Social Security disability benefit payments. (*Id.* at p. 323.) In concluding that a predeprivation hearing was not required, the court emphasized that " '[d]ue process is flexible and calls for such procedural protections as the particular situation demands.' " (*Id.* at p. 334; see *id.* at p. 349.) It articulated a general balancing test for resolving what process is constitutionally due, stating that the "identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Id.* at p. 335.)

The *Mathews* balancing test has been applied in various involuntary civil commitment and treatment proceedings. (See, e.g., *Heller v. Doe* (1993) 509 U.S. 312, 330–332 [concerning state procedures for involuntary commitment of mentally retarded persons]; *Washington v. Harper* (1990) 494 U.S. 210, 213, 229–231 [addressing whether a judicial hearing must precede

21

forcible administration of antipsychotic medication to state prison inmates]; *Addington*, *supra*, 441 U.S. 418, 425 [concluding the indefinite civil commitment of mentally ill patients requires a clear and convincing evidence standard of proof].)

## B.     *Barker* **and the Speedy Trial Cases**

*Barker, supra*, 407 U.S. 514, is the seminal case describing a criminal defendant's Sixth Amendment right to a speedy trial.  In *Barker*, the United States Supreme Court "refused to 'quantif[y]' the right 'into a specified number of days or months' or to hinge the right on a defendant's explicit request for a speedy trial.  [Citation.]  Rejecting such 'inflexible approaches,' *Barker* established a 'balancing test, in which the conduct of both the prosecution and the defendant are weighed.'  [Citation.]  '[S]ome of the factors' that courts should weigh include '[l]ength of delay, the reason for the delay, the defendant's assertion of [the] right, and prejudice to the defendant.' " (*Vermont v. Brillon* (2009) 556 U.S. 81, 89–90 (*Brillon*), quoting *Barker*.) None of these four factors is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.  Rather, they are related factors and must be considered together with such other circumstances as may be relevant.  In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." (*Barker*, at p. 533.)

The first factor, length of the delay, is a threshold inquiry.  "Until there is some delay which is presumptively prejudicial," a speedy trial analysis need not be undertaken. (*Barker*, *supra*, 407 U.S. at p. 530.)  The second factor examines the reasons offered by the government to justify the delay. "A deliberate attempt to delay the trial in order to hamper the defense should be weighed heavily against the government.  A more neutral reason such as

negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." (*Id.* at p. 531.) The third factor analyzes whether and when the defendant has pressed the speedy trial claim, with greater weight given to an early assertion of the right. (*Ibid.*) Finally, prejudice is evaluated in light of three interests intrinsic to a defendant's right to a speedy trial: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." (*Id.* at p. 532.)

In *Brillon*, *supra*, 556 U.S. 81, the United States Supreme Court revisited the balancing test established by *Barker*, finding no speedy trial violation in a nearly three-year delay bringing Brillon to trial on domestic assault and habitual offender charges. (*Id.* at pp. 84, 89.) In reversing the Vermont Supreme Court, it established a "general rule" that "delays sought by [assigned defense] counsel are ordinarily attributable to the defendants they represent," not to the State. (*Id.* at pp. 85, 94.) The *Brillon* court also concluded that "a defendant's deliberate attempt to disrupt proceedings [should] be weighted heavily against the defendant." (*Id.* at p. 94; see *id.* at pp. 84, 93 [noting Brillon sought the dismissal of his first attorney "on the eve of trial" and threatened the life of another attorney].) The court cautioned, however, that "[t]he general rule attributing to the defendant delay caused by assigned counsel is not absolute." (*Id.* at p. 94.) Delay caused by a "systemic 'breakdown in the public defender system' " or "institutional problems" could be chargeable to the state. (*Ibid.*)

The California Supreme Court addressed a speedy trial claim involving a seven-year delay in *People v. Williams* (2013) 58 Cal.4th 197 (*Williams*).

Employing a *Barker* analysis, the court found the length of the delay presumptively prejudicial. (*Id.* at p. 234.)  The court had no difficulty in concluding that the defendant suffered prejudice as a result of the delay, finding the length of his detention "oppressive" and a "serious" restraint on his liberty. (*Id.* at p. 235.)  However, the court's principal focus was on the reason for the delay, which it acknowledged was "the 'flag all litigants seek to capture.' " (*Id.* at p. 239.)  In analyzing this factor, the Supreme Court considered the conduct of the prosecution, the defense, and the trial court, and found no constitutional violation based on its analysis. (*Id.* at pp. 215, 251–252, 239.)

The *Williams* court found the prosecution directly responsible for only about five and a half months of the delay, and three months of this total was due to the illness of the prosecutor, a " 'strong excuse.' " (*Williams*, *supra*, 58 Cal.4th at p. 239.)  Moreover, the record showed "that the prosecution, far from trying to delay the trial, sought to try this case in a timely manner.  At numerous points from the early to the late stages of the pretrial period, the prosecution objected to continuances of the trial date.  When the defendant appeared to be 'in over his head' during the period of his self-representation, the prosecution forcefully objected to the delay and urged the trial court to revoke defendant's *Faretta* status.[8]  Similarly, after the sixth year of delay, the prosecutor arranged for [a victim] to address the court and implored the trial judge to deny any further requests for delay." (*Id.* at pp. 239–240.)  The Supreme Court concluded that the state prosecuted the case "diligently and was prepared to afford defendant a speedy trial." (*Id.* at p. 240.)

As for the defense, our high court found the defendant responsible for periods in which he had acquiesced in continuances, waived time, and

[8] *Faretta v. California* (1974) 422 U.S. 806.

engaged in self-representation in a dilatory fashion. (*Williams*, *supra*, 58 Cal.4th at p. 240.) The court also identified a roughly four-year period during which "the lion's share of delay resulted from defense counsel's lack of progress in preparing this case for trial." (*Id.* at p. 241.) Since the record did not contain evidence of a " 'systemic "breakdown in the public defender system," ' " the court concluded under *Brillon* that it must, "as a matter of law, charge the delay resulting from defense counsel's lack of progress to defendant." (*Ibid.*) Noting that *Brillon* spoke of "institutional problems" rather than the shortcomings of individual attorneys, the *Williams* court focused its inquiry "on whether a *systemic* breakdown has occurred, not on whether any particular attorney or attorneys performed deficiently." (*Id.* at p. 248.) While it observed that "the 'revolving door' of appointed counsel" in the case may be indicative of " 'institutional problems' " in the public defender system, the record had not been sufficiently developed in the trial court to support this conclusion. (*Ibid.*)

The Supreme Court turned finally to the conduct of the trial court in the matter, noting that "[d]efense counsel's lack of progress put the trial court in a difficult position. When a defense attorney requests more time to prepare for trial, the trial court must balance a defendant's right to a speedy trial with his right to competent counsel." (*Williams, supra,* 58 Cal.4th at p. 250.) At the same time, the Supreme Court recognized that " 'the trial court has an affirmative constitutional obligation to bring the defendant to trial in a timely manner,' " and that it is " 'entirely appropriate for the court to set deadlines and to hold the parties strictly to those deadlines unless a continuance is justified by a concrete showing of good cause for the delay.' " (*Id.* at p. 251.) " '[I]t must be remembered that " 'the primary burden' to assure that cases are brought to trial is 'on the courts and the prosecutors.' "

[Citation, quoting *Barker*, [*supra*,] 407 U.S. at p. 527.)] . . . The trial judge is the captain of the ship; and it goes without saying that the ship will go in circles if the crew is running around the deck with no firm marching orders.' " (*Id.* at p. 251.) While it did not find the trial court "directly responsible" for the delay in the case, our high court cautioned "that trial courts must be vigilant in protecting the interests of the defendant, the prosecution, and the public in having a speedy trial." (*Ibid.*) Based on the totality of the *Barker* factors, the court found no due process violation. (*Id.* at pp. 251–252.)

## C.    Timely Trial Claims in SVP Cases

### i.    *Litmon*

In *Litmon, supra*, 162 Cal.App.4th 383, the Sixth District Court of Appeal recognized that a person alleged by petition to be an SVP has a federal due process right to a timely SVP trial. (*Id.* at pp. 395–399.) At issue in *Litmon* was a year-long delay in holding a new trial on an SVP petition to extend Litmon's SVP commitment after the first attempt ended in mistrial in March 2006. (*Id.* at pp. 391–394.) The trial court initially set the retrial for January 2007 over Litmon's objection to allow for counsel and witness availability and updated evaluations. (*Id.* at pp. 391–392.) An August 2006 motion to dismiss filed by Litmon on due process grounds was denied by the court. In January 2007, the prosecutor obtained a continuance of the trial until March 2007 because he had failed to subpoena the expert witnesses in a timely manner, and several were unavailable. Litmon's second motion to dismiss on due process grounds was denied by the court. (*Id.* at pp. 393–394.)

Applying the three-part balancing test set out in *Mathews, supra*, 424 U.S. 319, the court in *Litmon* determined that forced civil confinement for mental health treatment constitutes " ' "a massive curtailment of liberty," ' " requiring due process protection. (*Litmon, supra*, 162 Cal.App.4th

at p. 400.)  Second, the court found " 'the risk of an erroneous deprivation of such interest through the procedures used' " to be "considerable." (*Ibid*.) Litmon had already been confined since May 2004 without any determination that he was an SVP and this "loss of liberty" was "irretrievable regardless of the outcome of the trial." (*Ibid*.)  It also pointed to the previous hung jury, which suggested the possibility that Litmon might not be determined to be an SVP at trial.  (*Id*. at p. 402.)  Third, the court acknowledged "the state's 'compelling protective interest in the confinement and treatment of persons who have already been convicted of violent sex offenses, and who, as the result of current mental disorders that make it difficult or impossible to control their violent sexual impulses, represent a *substantial danger* of committing similar new crimes.' " (*Id*. at pp. 400–401.)  However, the court emphasized that "the state has no interest in the involuntary civil confinement of persons who have no mental disorder or who are not dangerous to themselves or others." (*Id*. at p. 401.)

After balancing these competing interests, the *Litmon* court concluded "that the norm to comport with the demands of procedural due process in the context of involuntary SVP commitments must be a trial in advance of the potential commitment term since, under California law, the individual alleged to be an SVP is confined pending final determination of an SVP petition.  When an SVP trial does not take place until after or into the term of commitment at issue, the trier of fact never actually determines whether the person *was* an SVP while confined pending trial." (*Litmon, supra*, 162 Cal.App.4th at pp. 401–402.)

The court rejected the People's assertion that " 'eleven months is not an undue amount of time' " given the need for updated evaluations and to ensure the presence of experts at trial.  (*Id*. at p. 403.)  It noted that "[t]his proffered

27

justification reflects a 'business as usual' approach to trial scheduling despite the ongoing deprivation of personal liberty that was occurring," and concluded: "In our view, any chronic, systematic postdeprivation delays in SVP cases that only the government can rectify must be factored against the People." (*Ibid.*) The court faulted the People for its nine-month delay in securing the attendance of experts, and reminded the parties that "[t]he ultimate responsibility for bringing a person to trial on an SVP petition at a 'meaningful time' rests with the government." (*Id.* at pp. 405–406.)

The *Litmon* court reached the same conclusion under a *Barker* analysis. The court found that Litmon's detention since May 2004 without a determination that he was an SVP "certainly creates a presumption of prejudice" sufficient to trigger an analysis. (*Litmon*, *supra*, 162 Cal.App.4th at p. 405.) It found that Litmon strongly opposed postponement and asserted his due process rights several times. (*Ibid.*) As for the reasons for the delay, the court weighed the government's justification against it. (*Ibid.*) While the trial court's initial delay in setting the retrial appeared to be attributable to commonplace trial scheduling challenges rather than systemic issues, the court concluded that the subsequent continuance of the trial caused by the prosecution's failure to subpoena the expert witnesses could not be reconciled with due process given Litmon's "complete loss of liberty awaiting trial." (*Id.* at p. 404.) Finally, under a prejudice analysis, the court concluded: "In our view, lengthy postdeprivation pretrial delay in an SVP proceeding is oppressive. In this case, we cannot turn a blind eye to the years of pretrial confinement that have elapsed following expiration of the last ordered term of commitment." (*Id.* at pp. 405–406.) Balancing the relevant factors, the court concluded that the trial court should have granted Litmon's motion to dismiss the consolidated petitions in the case. (*Id.* at p. 406.)

28

### ii.    *Landau*

In *Landau, supra*, 214 Cal.App.4th 1, the Fourth District Court of Appeal applied the *Mathews* and *Barker* balancing tests and concluded that a seven-year delay from the filing of the SVPA petition against Landau to a third trial in which the jury found that Landau was an SVP (after two mistrials) did not violate his due process rights because the "vast majority" of the delays were at Landau's request or with his consent.  (*Id.* at p. 27.)  The court found that all but 20 days of the delay from the October 2000 filing of the SVP petition to the first trial in June 2006 resulted from defense strategy, including change of attorneys, as well as continuances which defense counsel stipulated to or requested.  (*Id.* at pp. 33, 35–36.)  While the length of the delay was "extreme" if considered as a whole, "when that delay was at appellant's request or with his consent, the weight accorded the delay is reduced.  [Citation.]  A potential civil committee may not seek to continue his trial over and over again and then be heard to complain the court violated due process by granting his requests."  (*Id.* at p. 37.)  The final 20-day delay in the trial due to court congestion did not appear to be a systemic or chronic problem, did not raise a presumption of prejudice, and did not violate Landau's due process rights under *Mathews* or *Barker*.  (*Id.* at pp. 36–38.)

Fourteen months of the 18-month delay before the second trial "was at the request of Landau's counsel and one month of the delay resulted from litigation over the People's discovery motion.  [Citation.]  As to the 43-day period in which the case trailed in ready status, the court concluded this delay due to court congestion and failure to prioritize SVP trials was 'unsatisfactory,' but did not deny Landau due process in light of the prior 14-month delay to which he consented."  (*Vasquez, supra*, 27 Cal.App.5th at p. 60.)

29

Finally, after Landau's second trial also ended in a mistrial in February 2008, retrial occurred within four and a half months, even with a new deputy district attorney assigned to the case in the interim. (*Landau*, *supra*, 214 Cal.App.4th at p. 43.) The court found that "the delay was not unreasonable given a new lawyer was assigned to the case after the mistrial, the complexity of the case, the number of experts involved, the reports to be read and digested, and the consideration to be given to the prior testimony of a number of witnesses in the two prior trials." (*Ibid.*) The final 98-day delay after both parties announced ready for trial was due to court congestion which, while not excusable, was not presumptively prejudicial for purposes of triggering a *Barker* inquiry. (*Id.* at pp. 42–44.) It thus did not violate due process. (*Id.* at p. 44.)

### iii. *Vasquez*

More recently, the Second District Court of Appeal analyzed a due process challenge brought by an alleged SVP defendant who was denied a trial for over 17 years in *Vasquez*, *supra*, 27 Cal.App.5th 36. Applying *Mathews* and *Barker*, the court affirmed the trial court's conclusion that the substantial pretrial delay was a due process violation necessitating dismissal of his SVP petition. (*Id.* at pp. 53–54.)

With respect to the *Barker* factors, the court concluded that "a 17-year delay before trial is by any measure an 'extraordinary' delay that triggers the *Barker* inquiry and weighs against the state." (*Vasquez*, *supra*, 27 Cal.App.5th at p. 61.) Moreover, although Vasquez did not strongly assert his right to a timely trial prior to 2016—when he exclaimed to the court " ' "enough is enough" ' "—the court found Vasquez's ability to assert his due process right before that date had been hindered. He only appeared in court one time from 2002 to 2012, and he only consented to continuances from 2014

30

to 2016 because he did not want to proceed to trial with an unprepared attorney. (*Id.* at pp. 61–62 & fn. 17.) Under these circumstances, the court did not give "significant weight" to this factor. (*Id.* at p. 63.) With respect to prejudice, the court opined that "[t]here can be no question that a 17-year delay from the filing of the petition caused an ' "oppressive" ' period of pretrial confinement" and concluded that this " 'presumption of prejudice' " would weigh heavily against the state if the cause of the delay was official negligence. (*Id.* at p. 64.)

The Court of Appeal then turned to the cause for the delay, which it deemed "the pivotal question" for its due process inquiry. Guided by *Williams*, the court considered the conduct of the prosecution, the defense, and the trial court. (*Vasquez, supra*, 27 Cal.App.5th at p. 64.) The defendant conceded that the prosecution was not responsible for the delay. The prosecution had repeatedly objected to further continuances of the trial date beginning in January 2015 and urged the trial court to remove the public defender's office and appoint new counsel so that the case could proceed to trial. (*Ibid.*)

As to the defense, Vasquez was charged with the first 14 years of the delay under *Brillon* because his defense counsel failed to move the case forward in a diligent manner. (*Id.* at p. 70.) However, beginning in October 2014, the trial court found that systemic dysfunction in the public defender's office was the cause behind a two-year delay in the proceedings. The court cited large budget cuts, defense counsel's inability to advance the case due to her workload, and her subsequent transfer out of the SVP unit on the eve of a trial date. (*Id.* at pp. 71–72.) This two-year delay—which the appellate court "viewed in light of both the 14-year delay that preceded it and the eight-month delay that followed, leading up to the motion to dismiss"—represented

31

the type of "breakdown in the public defender system" that must be charged to the state. (*Id.* at pp. 71, 73.) Given "the presumptively prejudicial 17-year delay, Vasquez's assertion of his right to a speedy trial . . . [in] 2016, and his limited ability to assert his right prior to that date, the oppressive nature of Vasquez's confinement for 17 years, and the systemic breakdown in the public defender system that caused the final two- to three-year delay in bringing Vasquez's matter to trial," the *Vasquez* court found no error in the trial court's conclusion that all four *Barker* factors militated in favor of Vasquez and against the state. (*Id.* at p. 74.)

The appellate court also concluded that the trial court "must share responsibility for some of the delay." (*Vasquez, supra*, 27 Cal.App.5th at p. 74.) Citing *Williams*, *Landau*, and *Litmon,* the court emphasized that " ' "the trial court has an affirmative constitutional obligation to bring the defendant to trial in a timely manner." ' " (*Ibid.*) "To the extent the trial court is responsible for a portion of the delay, it is attributable to the state." (*Ibid.*) During the first 14 years of Vasquez's pretrial confinement, the matter was continued over 50 times, either by stipulation of counsel or at defense counsel's request, and it did not appear from the record that "the trial court took meaningful action to set deadlines or otherwise control the proceedings and protect Vasquez's right to a timely trial." (*Id.* at pp. 74–75.) The court observed that "[e]ven where the attorneys stipulate to continue a trial date, the trial court has an obligation to determine whether there is a good cause for the continuance." (*Id.* at p. 75.) The court also expressed concern that, while Vasquez might not have been "seeking a speedy trial because he was facing evaluations supporting his commitment," it could not tell "because Vasquez was not present in court during most of this period."

(*Ibid.* [noting "[t]he trial court also has a responsibility absent a written time waiver to inquire of a defendant whether he or she agrees to the delay"].)

The *Vasquez* court concluded that the trial court "could have acted sooner" to address the later delay caused by the systemic issues in the public defender's office. It discussed at length the options the court should have considered, including the possible removal of the public defender's office so that an attorney with adequate time could have been appointed to prepare defendant's trial. (*Id.* at pp. 75–81.) In the end, as in *Williams*, the *Vasquez* court did not find the trial court directly responsible for the delay. However, the appellate court cautioned: "As the 'captain of the ship,' the trial court cannot passively preside over a case as it moves forward at a snail's pace without a trial date in sight." (*Id.* at p. 81.)

The Court of Appeal next addressed the *Mathews* balancing test, finding no error in the trial court's conclusion that *Mathews* also pointed to a due process violation in the case. (*Vasquez, supra*, 27 Cal.App.5th at pp. 81– 82.) The court noted the "significant deprivation of liberty" with a 17-year pretrial confinement, and it agreed with the *Litmon* court that, under the third factor, the state has no interest in the involuntary civil commitment of individuals who do not meet the SVP criteria. (*Ibid.*) Finally, it concluded that there was a " 'risk of an erroneous deprivation of [Vasquez's liberty] interest,' " given his lengthy commitment. (*Id.* at p. 81.) Even though "Vasquez had 23 positive evaluations, the outcome of a jury trial was not certain," especially given his participation in the sex offender treatment program starting in September 2015 and a later negative evaluation. (*Id.* at pp. 81–82.) Moreover, given the change in SVP law discussed above, "even if Vasquez had been committed after a trial, he was facing only a two-year commitment, and the People would have needed to file successive petitions to

continue his commitment, at least until the law provided for an indeterminate term of commitment, effective in 2007. [Citations.] Instead, Vasquez was detained on the original petition for 17 years." (*Id.* at p. 82.) Under both *Barker* and *Matthews*, the Court of Appeal concluded that the trial court did not err in dismissing Vasquez's SVP petition as a remedy for the deprivation of his due process rights. (*Id.* at pp. 82–83; see *DeCasas*, *supra*, 2020 Cal.App.LEXIS 879 [following *Vasquez*].)

## III. DUE PROCESS CHALLENGE IN THIS CASE

Although the district attorney faults the trial court's due process analysis on numerous grounds, the primary argument raised in this appeal is that the trial court erred as a matter of law by failing to attribute to Butler the entirety of the postdeprivation delay caused by his counsel in this matter as mandated by *Brillon*, *supra*, 556 U.S. 81. " 'In an appeal from an order granting a petition for habeas corpus after an evidentiary hearing, basic principles of appellate review apply, and thus, questions of fact and questions of law are reviewed under different standards. [Citation.] . . . [F]indings of fact will be accorded due deference under the substantial evidence standard. [Citation.] However, "[t]his court . . . independently reviews questions of law, such as the selection of the controlling rule." [Citation.] Mixed questions of law and fact are reviewed under the clearly erroneous standard if the inquiry is predominantly factual, but are reviewed de novo if the application of law to fact is predominantly legal.' " (*In re Andres* (2016) 244 Cal.App.4th 1383, 1393; accord *In re Collins* (2001) 86 Cal.App.4th 1176, 1181.) We see no reversible error in the trial court's conclusion that a due process violation occurred here.

34

A.    Application of the *Barker* Factors

    i.    *Length of the Delay*

We have no difficulty in concluding that the nearly 13-year delay from the filing of the SVP petition in November 2006 to the filing of the instant habeas corpus petition in April 2019 without a trial constituted a significant deprivation of liberty and was sufficient to trigger a *Barker* analysis. The district attorney does not argue otherwise. Indeed, it would be difficult to argue that the delay in this matter was anything other than extraordinary. (See *Doggett v. United States* (1992) 505 U.S. 647, 652 (*Doggett*) [noting "the extraordinary 8 1/2-year lag between [defendant's] indictment and arrest"]; *Barker*, *supra*, 407 U.S. at p. 533 [delay of over five years "extraordinary"]; *Williams, supra*, 58 Cal.4th at p. 235 [delay of seven years " 'extraordinary' "]; *Vasquez, supra*, 27 Cal.App.5th at p. 61 ["a 17-year delay before trial is by any measure an 'extraordinary' delay"].) We agree with the district attorney, however, that even a lengthy period of delay is not necessarily dispositive. It is one factor among several to balance in a due process analysis. (*Doggett*, at p. 652; *Vasquez*, at p. 69.)

    ii.    *Assertion of the Right*

Under *Barker*, a defendant's failure to assert a speedy trial violation is not dispositive. "A defendant has no duty to bring himself to trial; the State has that duty as well as the duty of insuring that the trial is consistent with due process." (*Barker, supra*, 407 U.S. at p. 527.) On the other hand, a defendant bears some responsibility for asserting the right, and the court should consider the "frequency and force of the objections" under the circumstances of the case. (*Id.* at pp. 528–529.) " 'The issue is not simply the number of times the accused acquiesced or objected; rather, the focus is on the surrounding circumstances, such as the timeliness, persistence, and

35

sincerity of the objections, the reasons for the acquiescence, whether the accused was represented by counsel, the accused's pretrial conduct (as that conduct bears on the speedy trial right), and so forth. [Citation.] The totality of the accused's responses to the delay is indicative of whether he or she actually wanted a speedy trial.' " (*Williams*, *supra*, 58 Cal.4th at p. 238.)

As we described above, the habeas court made several factual findings relevant to Butler's assertion of his right to a timely trial. It found that Butler made "sincere and repeated demands" for a timely trial as early as December 2006. The court based its finding on Butler's December 2006 letters to Judge Cartwright; Butler's March 2009 letter to counsel; McCormick's testimony during the August 2019 evidentiary hearing; Butler's statements during the December 2018 *Marsden* hearing; Klaus's statements to the court during that same hearing; and Butler's declaration submitted with the habeas petition. In the court's view, "Butler's letters to Judge Cartwright expressed a genuine desire to return to his family and society in general, coupled with concerns about whether he harmed himself by following counsel's advice," and were "sufficient to put the court on notice that Butler was not seeking to prolong the proceedings." Butler's March 2009 letter to counsel "unequivocally" stated that counsel was not authorized to waive time and demanded a timely trial. And Klaus acknowledged during the 2018 *Marsden* hearing that "the client file showed Butler made numerous demands for a speedy trial over the course of 12 years." In particular, Klaus noted two instances (September 2016 and November 2017) in which Butler told him he wanted a timely trial.

We reject the district attorney's contention that Butler did not assert his trial rights in a manner meaningful to a speedy trial analysis because he communicated those desires only to his appointed counsel, which failed to

convey his trial demands in open court and on the record. While it does not appear that the People were aware of Butler's desire for trial prior to the December 2018 *Marsden* hearing, the same cannot be said for the trial court, which received Butler's letters in 2006. Substantial evidence supports the habeas court's finding that these letters were sufficient to alert the court at an early stage of the proceedings of Butler's sincere desire to have a trial.

We also conclude that the assertion of the right is not negated by appointed counsel's failure to communicate their client's timely trial demand on the record. "The Constitution guarantees a criminal defendant both a speedy trial right and effective representation, and it puts the burden of securing both guarantees on the state." (*Williams*, *supra*, 58 Cal.4th at p. 238.) There is ample evidence that Butler asserted his right repeatedly throughout this period and was unequivocal that his public defenders were not authorized to waive time on his behalf, and yet his appointed counsel requested or acceded to over 50 continuances. McCormick, for example, did not put the matter on calendar after receiving Butler's March 2009 letter, but instead waited six weeks until the next scheduled court appearance to request a trial date, a date he then vacated at the next calling of the case. And although Butler demanded a trial upon first meeting Klaus in September 2016, Klaus did not add the case to calendar to request a trial date. Instead, he " 'began to talk' " to the prosecutor about " 'getting [a trial] going' " in November 2017 and the prosecutor did not request updated evaluations until September 2018. By his own admission, Klaus failed to set a trial date or move the case forward in a meaningful manner for over two years after being informed that Butler wished to exercise his timely trial right. The habeas court accordingly found that Butler had not waived his right to a speedy trial.

Under the circumstances, we cannot conclude that Butler acquiesced to his counsel's unauthorized waivers of time or that he waived his right to a timely trial. Waiver requires " 'an intentional relinquishment or abandonment of a known right or privilege' " (*Barker*, *supra*, 407 U.S. at p. 525), and the circumstances here show a person who sought in various ways to press his timely trial right and was finally compelled to seek the removal of his appointed counsel in December 2018 when his demands fell on deaf ears. Butler's early and repeated assertion of his timely trial demand deserves serious weight.

Even if the district attorney were correct that Butler had not asserted his due process right until the December 2018 *Marsden* hearing, we would conclude that this factor should not be held against him. In *Vasquez*, the trial court found "that Vasquez's ability to assert his speedy trial right was hindered by the fact that from February 2002 to February 2012 he never appeared in court." (*Vasquez*, *supra*, 27 Cal.App.5th at p. 62.) The appellate court agreed that "Vasquez could not realistically have asserted his due process rights during the 10-year period in which he largely did not appear in court." (*Ibid.*; see *DeCasas*, *supra*, ___ Cal.App.5th ___ [2020 Cal.App.LEXIS 879 at pp. 35–37] [declining to give DeCasas's failure to assert his due process rights significant weight where he appeared in court only sporadically and was never asked whether he wanted a speedy trial].) Similarly, Butler was not present in court from January 2007 to December 2018 and was therefore hindered in his ability to assert his right to a timely trial during this period. The habeas court also found no evidence that Butler's public defenders sought or obtained authorization from Butler to waive his appearance in court and no evidence that they explained to him his right to appear. Moreover, and in contrast to *Vasquez*, the habeas court

38

ultimately became aware of evidence indicating that Butler had repeatedly sought to assert his trial right throughout the period of his pretrial detention. Under the circumstances, the habeas court did not err in refusing to find that Butler had waived his timely-trial right.

### iii. Prejudice

Prejudice under *Barker* is judged by the impact of the delay on the interests the speedy trial right was designed to protect—"(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." (*Barker*, *supra*, 407 U.S. at p. 532.) Of these concerns, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." (*Ibid.*) As the district attorney correctly points out, SVP trials differ from criminal prosecutions in that the issue at trial—no matter when it is held—is whether an alleged SVP *currently* suffers from a mental disorder that creates a danger to society. (See § 6600, subd. (a)(3); *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1162 [The SVPA "clearly requires the trier of fact to find that an SVP is dangerous at the time of commitment. The statutory criteria are expressed in the present tense, indicating that each must exist at the time the verdict is rendered."].) Thus, many of the typical concerns triggered by delayed criminal prosecutions—faded memories, lost evidence, and missing or deceased witnesses (*Barker*, at p. 532; *Vasquez*, *supra*, 27 Cal.App.5th at p. 63)—may not be as pressing in SVP trials.

The district attorney overlooks, however, the prejudice that can arise from "oppressive pretrial incarceration." (*Barker*, *supra*, 407 U.S. at p. 532.) Several appellate courts have recognized this type of prejudice in SVP proceedings. (See *Vasquez*, *supra*, 27 Cal.App.5th at p. 64 ["There can be no

question that a 17-year delay from the filing of the petition caused an ' "oppressive" ' period of pretrial confinement."]; *Litmon*, *supra*, 162 Cal.App.4th at p. 406 ["[L]engthy postdeprivation pretrial delay in an SVP proceeding is oppressive. In this case, we cannot turn a blind eye to the years of pretrial confinement that have elapsed following expiration of the last ordered term of commitment."]; cf. *Williams*, *supra*, 58 Cal.4th at p. 235 ["We have no difficulty concluding, even in light of the complexity of the case and the need for adequate preparation, that being jailed without a trial for seven years is 'oppressive.' "].) The habeas court in these proceedings, citing *Williams*, *Vasquez,* and *Litmon*, concluded that "Butler was prejudiced by the nearly 13[-]year delay." We agree. Butler's forced confinement in a state hospital for 13 years while he awaited a trial on his SVP petition—a trial he pleaded with his counsel and the court to set as soon as possible—is unquestionably an oppressive experience.

We reject the district attorney's suggestion that, far from being prejudicial, the lengthy delay in this case likely worked to Butler's advantage. Noting that Butler had reentered sex offender treatment sometime after November 2017 in preparation for the anticipated trial, the district attorney argues that the delay gave Butler the opportunity to engage in sex offender treatment, which could have resulted in findings that he did not meet the SVP commitment criteria. The district attorney also points to age and the potential for declining health as factors which decrease the likelihood of reoffense over time and are thus positively impacted by delay. The problem with this argument, of course, is that it starts from the flawed premise that the extended pretrial confinement of alleged SVPs is otherwise justifiable. Had an early trial been held in this matter, it is equally plausible that Butler might not have been found to be an SVP or that he might have

engaged in sustained sex offender treatment years ago, which could have led to his release or supported a petition for conditional or unconditional release. (§§ 6604.9, 6605, 6608.)  We will never know, however, because, as the trial court recognized:  " '[T]ime once past can never be recovered.' "  (*Vasquez, supra*, 27 Cal.App.5th at p. 64.)

Moreover, as the United States Supreme Court has recognized, "consideration of prejudice is not limited to the specifically demonstrable, and . . . [thus] affirmative proof of particularized prejudice is not essential to every speedy trial claim."  (*Doggett, supra*, 505 U.S. at p. 655.)  Rather, "we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify.  While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria, [citation], it is part of the mix of relevant facts, and *its importance increases with the length of delay*."  (*Id.* at pp. 655–656, italics added.)

The high court in *Doggett* went on to discuss how the importance of presumptive prejudice varies with the reason for the delay, explaining: " 'Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground.  While not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him. . . .  [¶]  . . . Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun.  And such is the nature of the prejudice presumed that the weight we assign to official negligence

41

compounds over time as the presumption of evidentiary prejudice grows. Thus, our toleration of such negligence varies inversely with its protractedness, [citation], and its consequent threat to the fairness of the accused's trial.' " (*Williams*, *supra*, 58 Cal.4th at p. 237, quoting *Doggett*.)

In the present case, the trial court concluded that the "root cause" of the postdeprivation delay was "official negligence" and presumed prejudice on that basis. We agree that the delay here, as in *Doggett*, was sufficiently protracted that the presumption of prejudice would weigh heavily in Butler's favor *if* the cause of the delay was official negligence. We thus turn to an examination of this crucial question.

### iv.    *Reasons for the Delay*

When considering the governmental justification for the delay under *Barker*, "different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. . . . [A] valid reason, such as a missing witness, should serve to justify appropriate delay." (*Barker*, *supra*, 407 U.S. at p. 531.) As the California Supreme Court did in *Williams* and the Second District did in *Vasquez*, we discuss the conduct of the prosecution, the defense, and the trial court when analyzing the reasons for the delay. (See *Williams*, *supra*, 58 Cal.4th at p. 239; *Vasquez*, *supra*, 27 Cal.App.5th at p. 64.) Our goal is to determine " 'whether the government or the [alleged SVP] [was] more to blame for th[e] delay' " in the case. (*Brillon, supra*, 556 U.S. at p. 90.)

<u>The Prosecution</u>

The habeas court found that at least six different prosecutors appeared on Butler's matter. During the 13 years this case was pending, the court found that "[t]he People never objected, on the record, to a single continuance. The People never asked, on the record, that the court find good cause for any continuance. The People never declared, on the record, that they were ready for trial." On this record, the court concluded Butler had proven "that the People abandoned their role as the plaintiff in this case." Indeed, the court found that "the People had no intention of moving the case past the initial probable cause hearing in January 2007 and were content with indeterminate delays . . . because Butler had been and remains detained." While the court found no evidence of intentional bad faith delay by the prosecution, it rejected the prosecution's position that the People "had no obligation to do *anything*." Rather, the court concluded that "since the People are responsible for prosecuting the case, the People cannot avoid their duties to move the case forward by passively deferring to the defense and the court." It therefore found that the prosecution bore some responsibility for the delay.

On appeal, the district attorney does not challenge the trial court's factual findings, relying instead on the notion that it was under no obligation to bring the matter to trial. She asserts that there is "no evidence in the record that the district attorney's office was unavailable or otherwise unprepared to afford [Butler] a timely trial had *he* been willing to set a trial date." (Italics added.) She points out that the prosecution has no state constitutional right to a speedy trial in SVP cases as it does in criminal cases. (See Cal. Const., art. I, § 29.) And she posits that there was no basis for the prosecution to object to the bulk of the continuances in this matter because it already had everything it wanted: "[T]he People's interests are satisfied if a

43

person whom it is reasonably believed currently meets criteria as an SVP remains detained in a secure treatment facility."[9]  These arguments fundamentally misapprehend the prosecution's due process obligations in civil commitment proceedings under the SVPA.

This is not a case about the prosecution's rights or interests.  It is a case about its constitutional obligations.  As the United States Supreme Court declared in *Barker*, the state has the duty to bring an accused individual to trial "as well as the duty of insuring that the trial is consistent with due process." (*Barker, supra*, 407 U.S. at p. 527; see *Dickey v. Florida* (1970) 398 U.S. 30, 37–38 ["[a]lthough a great many accused persons seek to put off the confrontation as long as possible, the right to a prompt inquiry into criminal charges is fundamental and the *duty of the charging authority is to provide a prompt trial*," italics added].)  This duty has been recognized in the forced confinement of alleged SVP defendants as well. (*Litmon, supra*, 162 Cal.App.4th at p. 406 ["The ultimate responsibility for bringing a person to trial on an SVP petition at a 'meaningful time' rests with the government."].)  Thus, even if the People had no right to a speedy trial and no particular interest in disturbing the status quo so long as Butler remained

---

[9] We reject the suggestion that the state's interest in an SVP proceeding is satisfied by indefinite pretrial detention of an alleged SVP defendant.  The district attorney relies on *Moore v. Superior Court* (2010) 50 Cal.4th 802, 815, in asserting that "[t]he societal interest served by the SVPA is solely to confine alleged SVPs in a secure treatment facility 'until their dangerous disorders recede and they no longer pose a societal threat.' " In fact, *Moore* says nothing about "alleged SVPs."  Rather, it stresses that, under the SVPA, "[c]ommitment depends upon whether the person *is found to be* an SVP—a finding that ensures the Act applies to only 'the most dangerous offenders.' " (*Moore*, at p. 815, italics added.)  Moreover, as other courts have recognized, the state has no interest in the involuntary civil confinement of persons who do not qualify as SVPs.  (See *Litmon, supra*, 162 Cal.App.4th at p. 401.)

detained, the People have a constitutional obligation to ensure that Butler's due process right to a timely SVP trial is met.

The People's due process obligation in an SVPA proceeding cannot be defined with precision, as *Barker* recognized that a speedy trial analysis entails a careful weighing of the different factors and the circumstances of each case. (*Barker*, *supra*, 407 U.S. at p. 533.) However, certain examples illuminate when the government's conduct may fall on the wrong side of the divide between "diligent prosecution" and "official negligence" in bringing the accused to trial. (*Doggett*, *supra*, 505 U.S. at p. 656–657.) For example, the prosecutors in both *Williams* and *Vasquez* were excused from any culpability for the extraordinary delays in those cases only because they took proactive measures to push the matters towards trial. (*Williams*, *supra*, 58 Cal.4th at pp. 218, 239–240; *Vasquez*, *supra*, 27 Cal.App.5th at p. 64.) In *Williams*, the prosecution objected throughout the proceedings to continuances of the trial date, stated on the record it was ready for trial, and urged the trial court to revoke the defendant's *Faretta* status when his self-representation led to unnecessary delays. (*Williams*, at pp. 218, 228–230, 239–240.) In *Vasquez*, the prosecution repeatedly objected to further continuances of the trial date and urged the trial court to remove the public defender's office and appoint new counsel so that the case could proceed to trial. (*Vasquez*, at p. 64.) Conversely, the prosecution's failure to secure the attendance of experts for trial in *Litmon*, causing unnecessary delay at the end of an already extensive pretrial delay, was a factor that weighed against the government's obligation to ensure a prompt SVP trial. (*Litmon*, *supra*, 162 Cal.App.4th at p. 404–405.)

These authorities make clear that the People's due process obligation in an SVPA proceeding requires that it diligently prosecute the case. This may

45

entail stating on the record that it is prepared to go to trial, taking affirmative steps to set a trial date, promptly requesting clinical evaluations and records, and securing the attendance of witnesses in a timely manner. Continuance requests, whether by defense counsel or the prosecution, should be supported by an affirmative showing of good cause, and where such a showing is lacking, an objection to the request may be warranted. Where the prosecution encounters repeated continuances of a setting hearing or trial date, or other dilatory tactics, diligent prosecution of an SVP petition may necessitate objecting to the delays, insisting upon trial deadlines, and making the trial court aware of the length of time since the filing of the SVP petition or other pertinent details from the record. The prosecution may even find it necessary to seek the removal of appointed counsel, the appointment of new or additional counsel, or other measures to ensure that an alleged SVP defendant is brought to trial at a meaningful time and in a meaningful manner.

It was incumbent on the district attorney's office here to take affirmative steps to prosecute its case against Butler and bring him to trial on the SVP petition, and it abandoned this responsibility. It bears mentioning, however, that the district attorney did not simply fail to act. Several of the prosecution's own actions contributed to unwarranted delays in the trial. The first trial date of June 2008 was vacated at the prosecution's request due to a "scheduled vacation," which appears to have been scheduled at some time *after* the June 2008 trial date had already been set. The habeas court found several other continuances that were sought by the prosecution or by agreement of the parties, including in December 2008, May, July, and November 2012, and February and June 2015. For example, on November 1, 2012, the prosecution appeared and asked to have the pending probable

cause hearing continued to April 5, 2013. The probable cause hearing had already been continued several times, and no explanation was given by the prosecution for the requested five-month delay. As noted above (see fn. 4, *ante*), Butler had been detained without a finding of probable cause since the May 2012 order, and there is no evidence that the prosecutor brought this order to Judge Hymer's attention or insisted that this statutory requirement be enforced or the order revisited on the basis of *Reilly*. (§ 6602, subd. (a).) We question whether such inaction on the part of the government as to a fundamental protection for the accused comports with the requirements of due process.[10]

Finally, as the habeas court also noted, Butler's public defender Klaus testified that he began speaking with the prosecution in November 2017 about setting a trial date, but it was not until September 2018—about 10 months later—that the prosecution ordered new evaluations. No explanation for this delay has been pointed out in the record. Even if we focused solely upon the prosecution's own actions, rather than its mere acquiescence to defense counsel's delays, we would find substantial evidence in support of the habeas court's finding that the prosecution was directly responsible for at least some of the delay in this matter.

But we do not view the government's responsibility so narrowly. Given the extensive delay in this case and the district attorney's abdication of its

---

[10] The ethical obligations that guide prosecutors in criminal proceedings apply with equal force is SVP proceedings. These obligations require them to facilitate justice, not to achieve a particular adversarial goal. (*People v. Kelley* (1977) 75 Cal.App.3d 672, 689.) As surrogates for the People of the State of California (Gov. Code, § 100, subd. (b)), they have a special duty to ensure the fairness and reliability of both the justice process and the outcomes of that process. (*Berger v. United States* (1935) 295 U.S. 78, 88; *United States v. La Page* (9th Cir. 2000) 231 F.3d 488, 492.)

duty to ensure that Butler received a timely trial, we conclude that the prosecution bore significant responsibility for the delay. At the very least, its actions (or lack thereof) supply the official negligence necessary to presume prejudice.

The Defense

At least eight public defenders appeared in Butler's matter, including the five assigned public defenders discussed above. In the 12 years in which the Alameda County Public Defender represented Butler, the office waived Butler's personal appearance 60 times without obtaining his authorization to do so, never once conveyed in open court Butler's demands for a trial, requested or acquiesced to over 50 continuances of time without objection, and filed a total of four motions on Butler's behalf.

The habeas court found that a full year passed before the first trial date was set, yet there was little to no evidence in the record as to why. Although the first trial date was vacated at the People's request, McCormick agreed to the request because he "did not have doctors for that case yet" and was not ready for trial. McCormick later testified that he requested a January 2010 trial after receiving Butler's letter demanding a trial, only to vacate the second trial date because it apparently conflicted with another preexisting trial date. Why he would choose that trial date in the first place is unclear because the trial court did not ask him.

In the five-year period between 2011 and 2016, Butler was primarily represented by two public defenders, Higgins and Elenteny. Higgins undertook the task of completing the *Ronje* motion to dismiss begun by McCormick, a motion that required *three* years to prepare. The *Ronje* motion succeeded in part, and in May 2012 the trial court granted Butler's request for new evaluations and a new probable cause hearing. Despite this hard-

48

earned victory, Higgins agreed to the prosecution's requests to continue the probable cause hearing to July 2012, then November 2012, then again to April 2013, the last request unaccompanied by any good cause basis for a five-month delay. Neither Higgins nor Elenteny, who was assigned to the Butler matter in February 2015, ever demanded that Butler receive a probable cause hearing. That the public defender's office would allow their client to be held on the SVP petition for the next six years without a finding of probable cause is deeply concerning, if not deficient.

At the 2018 *Marsden* hearing, Klaus acknowledged that the office was aware of Butler's March 2009 letter demanding a trial. Klaus also confirmed that when he met with Butler in September 2016, Butler asked for a trial date to be set. Butler reiterated his trial demands to Klaus in November 2017 and expressed "real concern" how he kept getting transferred from lawyer to lawyer in August 2017. Despite the client insisting that he be given a trial, Klaus did not add the case to calendar to request a trial date. Instead, he " 'began to talk' " to the prosecutor about " 'getting [a trial] going' " in November 2017, and the prosecutor did not request updated evaluations until September 2018. By his own admission, Klaus failed to set a trial date or move the case forward in a meaningful manner for over two years after Butler conveyed his demand for trial. At the *Marsden* hearing, Klaus denied that his office had represented Butler incompetently and indicated he needed to hire experts to assess the new evaluations and anticipated selecting a trial date for some time in the winter or early spring of 2019. This refrain from the public defender's office—that it needed to "hire experts" and a trial date was just around the corner—rings hollow as the habeas court found no evidence that any of Butler's public defenders ever retained or consulted a defense expert on his behalf. In short, there is

abundant evidence to support the habeas court's finding that Butler's public defenders essentially ignored and disregarded his demands for a timely trial and his express direction that counsel was not authorized to waive time on his behalf.

It is true that under *Brillon*, delay caused by defense counsel, including "[a]n assigned counsel's failure 'to move the case forward,' " is generally charged to the defendant. (*Brillon, supra*, 556 U.S. at pp. 90–92.)  This general rule, however, "is not absolute," and delays caused by a "systemic 'breakdown in the public defender system' " or "institutional problems" can be chargeable to the state. (*Id.* at p. 94.)  In *Williams*, the California Supreme Court observed that "[i]t is possible that the 'revolving door' of appointed counsel in this case is indicative of 'institutional problems' [citing *Brillon*]" but it found the record on appeal inconclusive on this point. (*Williams, supra*, 58 Cal.4th at p. 248.)  There are several factors here suggesting that the public defender's mismanagement of this case went beyond any particular attorney's performance.  The office's collective failure to convey Butler's trial demands, its disregard of the express wishes of the client, its failure to demand a probable cause hearing or to engage or consult with a defense expert or come close to being ready for trial, its relay race of substituting counsel, its unexplained delays and piecemeal litigation seemingly without purpose other than to forestall trial—are all circumstances that arose across all or multiple public defenders and suggests a systemic deficiency in the management and supervision of this SVP case.

Like the habeas court, however, we need not resolve whether there was a systemic breakdown in the public defender's office.  The habeas court concluded that it would be fundamentally unfair to hold Butler personally and solely accountable for delays caused by his counsel under such

50

circumstances, and it therefore determined "reluctantly" that Butler should be assigned some—"but not all or even most"—of the responsibility for the delay in this case. We agree with the court's reasoning, and conclude that even if some of the delay must be charged to Butler as a matter of law, substantial evidence supports the habeas court's determination that the bulk of the delay may be attributed to the actions (and inactions) by the state.

The Trial Court

Judge Cartwright was assigned to Butler's case from December 2006 to December 2013. The habeas court found that Judge Cartwright allowed all three trial dates in this matter to be vacated without any showing of good cause and permitted the matter to be continued on 25 other occasions without ever finding good cause on the record. Moreover, after ordering a new probable cause hearing in May 2012, the court allowed the probable cause hearing date to be continued multiple times and then dropped without explanation. Similarly, during the time the case was assigned to Judge Hymer between January 2014 and May 2019, "[t]here is no evidence the court ever set a second probable cause hearing. There is no evidence the court ever set a trial date. There is no evidence the court ever required an on-the-record showing or finding of good cause before granting a continuance." The habeas court found that Butler's matter was on calendar 66 times during the pendency of the case, but Butler only appeared in court six times—four times in December 2006 and January 2007 and twice in December 2018. The habeas court found that "[t]here [was] no evidence the [trial] court ever asked counsel whether Butler objected to the continuances or wanted a trial," and "[e]xcept for the *Marsden* hearing, there is no evidence the court ever ordered Butler to be transported to court to ascertain his wishes."

51

The habeas court determined that Butler had proven that the courts failed to honor Butler's due process right to a timely SVP trial: "By granting 12 years of continuances in Butler's absence, without maintaining trial dates, without requiring counsel to demonstrate good cause on the record, without determining Butler's wishes from Butler, the courts allowed the People to abandon their role[] as the plaintiff and allowed defense counsel to ignore Butler's repeated and sincere demands for a speedy trial." Thus, the trial court and therefore the state was responsible for the delays.

The district attorney attempts to justify the trial court's mismanagement of the case by arguing that "to the extent that it appears that the defense is pursuing a reasonable strategy, courts should be reluctant to intrude into the attorney-client relationship." She suggests that it should be left to the defense to drive the case, and the court should feel no "affirmative obligation to bring an SVP respondent to trial when he sincerely does not wish one or otherwise over his objection." This argument flies in the face of the precedent previously discussed which creates just such an affirmative obligation. (See *Barker*, *supra*, 407 U.S. at p. 529 ["the primary burden [is] on the courts and the prosecutors to assure that cases are brought to trial"]; *Williams*, *supra*, 58 Cal.4th at p. 251 [" 'the trial court has an affirmative constitutional obligation to bring the defendant to trial in a timely manner' "]; *Vasquez*, *supra*, 27 Cal.App.5th at p. 77 [" 'It is the obligation of the prosecutor and the court to try the accused in a timely manner, and this duty requires a good-faith, diligent effort to bring him to trial quickly. [Citation.] . . . And, most importantly, it is the obligation of the trial court to ensure that the prosecution and the defense fulfill their respective obligations.' "]; see *DeCasas*, *supra*, ___ Cal.App.5th ___ [2020 Cal.App.LEXIS 879 at pp. *44–*45 ["For purposes of the *Barker* analysis, to

the extent the court's failure to fulfill its obligation as a protector of the right to a speedy trial caused the delay, that delay is attributable to the state."]; *id.* at p. *47 [finding no error in the trial court's conclusion that " 'the [s]tate had failed [DeCasas]' "].)

Moreover, as the *Williams* court recognized, courts manage cases routinely and appropriately without intruding on the attorney-client relationship. (*Williams, supra,* 58 Cal.4th at p. 251 [finding it " 'entirely appropriate for the court to set deadlines and to hold the parties strictly to those deadlines unless a continuance is justified by a concrete showing of good cause for the delay' "].) And apparently the Legislature agrees, as effective January 1, 2020, it amended the SVPA to require that any request to continue a trial date in an SVP proceeding must be in writing and may be granted only upon a showing of good cause and only for the period of time shown to be necessary by the evidence considered at the hearing on the motion. (§ 6603 subd. (c), as added by Stats 2019, ch. 606, § 1.)[11]

Substantial evidence supports the habeas court's determination that the trial court was responsible for a portion of the delay, and therefore this delay is attributable to the state. (*DeCasas, supra,* ___ Cal.App.5th ___ [2020 Cal.App.LEXIS at pp. *43–*45];*Vasquez, supra,* 27 Cal.App.5th at p. 51; *Litmon, supra,* 162 Cal.App.4th at p. 406.) The record discloses that the matter was continued over 50 times, either at the request of the defense or the prosecution or by stipulation, and there is no evidence that the trial court

---

[11] We recognize that this new legislation applies only once a trial date has been set. But we reject the district attorney's suggestion that a court's constitutional obligation is similarly limited and arises only once the alleged SVP asks to go to trial. If an alleged SVP could put off trial indefinitely, the state's duty to ensure that the case is diligently prosecuted and that the alleged SVP's due process right to a timely trial is protected becomes meaningless.

required counsel to provide a good cause basis for any continuance, and no evidence that the trial court ever made an on-the-record finding of good cause to justify the delay.

The *Vasquez* court's criticism of the trial court's handling of that SVP matter applies with equal force here: "It does not appear from the record that during the [12]-year period the trial court took meaningful action to set deadlines or otherwise control the proceedings and protect [Butler's] right to a timely trial." (*Vasquez, supra*, 27 Cal.App.5th at p. 51.) Nor is there any indication in the record that the trial court ever inquired as to why the case had dragged on after so many years and no attempt was made to determine whether the public defender's office or prosecution had done anything to prepare adequately for trial.

That the trial court overlooked the May 2012 order requiring a second probable cause hearing is telling. We are cognizant that an SVP proceeding is typically complex, and one with a long procedural history as this case all the more so. That is why trial courts must rely in part on counsel, as officers of the court, to stay abreast of pertinent procedural matters. Nevertheless, to fulfill its constitutional obligation to bring a defendant to trial in a timely manner, the trial court must closely monitor the progress in the case and conduct the necessary inquiries into the status of the proceedings. That is difficult to do if the alleged SVP defendant is never present in court and if his counsel is never asked what his client actually wants. Given these facts, we cannot fault the habeas court's conclusion that the trial court was responsible for a portion of the delay.

***

In sum, the habeas court found under *Barker* that the prosecution, Butler (through his counsel), and the trial court were all responsible to some

54

degree for the extraordinary delay in this case, and substantial evidence supports these findings. The purely legal question which remains is whether, when multiple parties each bear some responsibility for the same period of delay, *Brillon* requires that the delay be charged solely to the defense. We believe such as reading of *Brillon* is unnecessarily narrow, especially where, as here, there is evidence that defense counsel disregarded Butler's demand for a timely trial.

As *Barker* established, no factor in a speedy trial analysis is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." (*Barker*, *supra*, 407 U.S. at p. 533.) Further, *Barker* itself made clear that the actions of defense counsel are not always attributable to the defendant. Rather, the Court explained that a balancing approach allows "a court to attach a different weight to a situation in which the defendant knowingly fails to object from a situation in which [defense counsel] acquiesces in long delay without adequately informing [the defendant]." (*Id.* at p. 529.) Moreover, while *Brillon* holds generally that "delay caused by the defendant's counsel is also charged against the defendant" (*Brillon*, *supra*, 556 U.S. at pp. 90–91), it does not specify how much weight such delay must be given in the overall *Barker* analysis. Indeed, *Brillon* itself counsels that the goal of the *Barker* analysis is to determine " 'whether the government or the criminal defendant [was] more to blame for th[e] delay.' " (*Id.* at p. 90.)

Here, under *Brillon*, a portion of the delay in the case was chargeable to defense counsel and thus, under agency principles, to Butler. But given the habeas court's express findings that Butler's public defenders ignored his demands for a timely trial and waived time without his authorization, we do

55

not believe it was improper under *Brillon* and *Barker* to give this fact diminished weight.  Moreover, the habeas court found that both the prosecution and the trial court were also responsible for the same delay, meticulously detailing a record of unjustifiable delay and inaction by both state actors.  Since the ultimate obligation to bring an alleged SVP to trial falls on the state, we do not think that the habeas court erred under *Barker* and *Brillon* in concluding on these facts that the state was more to blame for the delay than Butler.

Even if *Brillon* makes it necessary to find that there was a "systemic breakdown" or "institutional problems" in the case to avoid charging Butler with the bulk of the delay in this matter, we conclude that the habeas court made, or at least implied, such a finding.  While the habeas court found it unnecessary to consider whether there was a fundamental breakdown in the public defender system, it concluded that "the evidence here shows a systemic breakdown with the management of this case."  We could not agree more.  As the habeas court's detailed recitation of the facts makes clear, what occurred in these SVP proceedings was a perfect storm of institutional dysfunction.  A series of prosecutors completely ignored their duty to bring Butler to trial in a manner consistent with due process.  A series of public defenders failed to take seriously their client's desire for, and right to, a timely trial.  And the judges who managed the case for over 12 years did little to ensure that the prosecution and the defense fulfilled their respective obligations.  In the criminal context, such official negligence and systemic breakdown has been described as " 'what happens when each participant in the criminal justice system fails to meet his or her respective obligations.  Cases drag on endlessly from continuance to continuance; evidence and documents are lost; witnesses cannot be located; the accused sits in jail "deteriorating" and

becoming increasingly frustrated with counsel; and the prosecution and the defense adopt a "stream of consciousness" approach, raising one issue and resolving that, then raising another and resolving that, followed by another, and then another. Meanwhile, the right to a speedy trial swings aimlessly in the breeze.' " (*Vasquez, supra*, 27 Cal.App.5th at p. 77, quoting *State v. Couture* (2010) 240 P.3d 987, 1015.) Here, it justifies the habeas court's conclusion that the state was more to blame for the delay. And this fact, along with the length and presumptively prejudicial nature of the delay, Butler's early and repeated assertion of his timely trial right, and his lack of opportunities to convey his wishes to the trial court for the bulk of these proceedings, amply supports the court's ultimate conclusion that Butler's due process rights were violated.

## B.    Application of the *Mathews* Test

Consideration of the *Mathews* factors does not convince us otherwise. The first and third factors are always the same in an SVP case. With respect to the first factor—the private interest at stake—it is clear that forced civil confinement for mental health treatment constitutes " ' "a massive curtailment of liberty," ' " requiring due process protection. (*Litmon, supra*, 162 Cal.App.4th at p. 400; accord *Vasquez, supra*, 27 Cal.App.5th at p. 81.) As to the third factor, the government undeniably has a " 'compelling protective interest in the confinement and treatment of persons who have already been convicted of violent sex offenses, and who, as the result of current mental disorders that make it difficult or impossible to control their violent sexual impulses, represent a *substantial danger* of committing similar new crimes.' " (*Litmon,* at pp. 400–401.) But the state has no interest in detaining individuals who do not qualify as SVPs. (*Id.* at p. 401.) Moreover, "[e]ven in situations justifying postdeprivation hearings, '[a]t some point, a

delay in the . . . hearing would become a constitutional violation.'" (*Id.* at p. 396.) Thus, in our view, the governmental interest in continued detention of an alleged SVP lessens as the delay increases without a determination that the individual is, in fact, an SVP.

The risk of erroneous deprivation under the second *Mathews* factor also increases with the length of the delay. In some cases, a previous hung jury, or a subsequent negative evaluation, or renewed participation in sex offender treatment as the case ages may suggest the possibility that the alleged SVP might not be determined to be an SVP at trial, increasing this risk. (See, e.g., *Vasquez, supra*, 27 Cal.App.5th at pp. 81–82 [negative evaluation and entering treatment]; *Landau, supra*, 214 Cal.App.4th at p. 41 [hung jury]; *Litmon, supra*, 162 Cal.App.4th at p. 402 [hung jury].) But even absent such circumstances, extraordinary pretrial delay increases the risk that an erroneous deprivation of an alleged SVP's liberty interest has occurred. (*Vasquez*, at p. 81.) The right to a trial is not a mere formality. "It may well be there was strong evidence in the People's favor, but it was the government's burden to prove [Butler] was an SVP and [Butler] had a right to present evidence showing he did not pose a risk to the public." (*Vasquez*, at pp. 63–64.) As we recently confirmed in *Couthren, supra*, 41 Cal.App.5th 1001, a probable cause finding is not a determination of the merits of the petition and thus is no substitute for an SVP trial. (*Id.* at p. 1009.) Indeed, in finding probable cause, the trial court need only determine " 'whether a reasonable person *could entertain a strong suspicion* that the petitioner has satisfied all the elements required for a civil commitment as an SVP.'" (*Ibid.*) Thus, while a probable cause determination may justify some level of postdeprivation detention, the procedures undergirding this requirement cannot substitute for a finding, beyond a reasonable doubt, that the statutory

elements under the SVPA have been met. Under the circumstances of this case, the trial court did not err in concluding under *Mathews* that Butler's due process rights had been violated.

In the end, the responsibility falls on the petitioner to bring an SVP case to resolution at a meaningful time and in a meaningful manner, and on the court to ensure that the matter proceeds efficiently and effectively, even where the alleged SVP might prefer delay. In the absence of *any* showing of diligent prosecution or effective case management in these proceedings, it was simply not a valid exercise of governmental power to detain Butler for more than 12 years without a merits trial establishing the legitimacy of that detention. On this record, we see no basis under either *Mathews* or *Barker* for disturbing the trial court's finding of a due process violation.

## IV. DISPOSITION

The judgment is affirmed. Our previously granted stay shall dissolve upon issuance of the remittitur in this matter.

 

_____

Sanchez, J.

WE CONCUR:

_____

Humes, P. J.

_____

Banke, J.

Trial Court:          Alameda County Superior Court

Trial Judge:          Hon. Morris Jacobson

Counsel:

Nancy E. O'Malley, District Attorney, Armando Pastron, Jr., Deputy District Attorney, for Petitioner the People.

Rudy Kraft, under appointment by the Court of Appeal, for Respondent Terrance Butler

*A159247 In re Butler / A159122 O'Malley v. Superior Court (Butler)*